UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-10006-CR-MOORE

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BENJAMIN MOORE,

    Defendant.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the Defendant's Motion to Suppress Physical Evidence (ECF No. 16), which was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation. The motion is fully briefed and an evidentiary hearing was held on April 21, 2017.

The Defendant is charged with possession of a firearm as a convicted felon, possession of an unregistered firearm and possession of a firearm not identified by a serial number. He seeks to suppress evidence seized in a warrantless search of his residence, in particular the firearm which is the subject of the instant Indictment. The Government contends that no warrant was required because the victim, who also lived at the residence, gave implied consent to the search. Alternatively, the Government argues that exigent circumstances justified the warrantless search.

### I. EVIDENCE PRESENTED

The Government called as its first witness Monroe County Sheriff's Office (MCSO) Deputy Lazaro Valdes. Deputy Valdes stated that he is a road patrol officer who has worked for the MCSO for 25 years. He has responded to at least 100 domestic violence calls, and explained that in such instances safety is the first priority: making sure that the parties are separated and that the altercation does not escalate.

Deputy Valdes related that approximately 5:45 a.m. on August 9, 2016, he responded to a 911 call from a woman who resided at 43A 8th Avenue, Stock Island, Florida. He identified Government's Exhibit 1 as containing excerpts from the calls made by the victim, Ms. Golding. During the first call, Ms. Golding says that a man has a weapon, after which a man's voice is heard and the call is terminated. Ms. Golding then calls back, and says that the man, whose name was Benjamin Moore, has a knife, and that they are now out on the street. She further states that her last name also is Moore.

Deputy Valdes proceeded to the residence, but stopped first at the corner of 5th Street and 8th Avenue, where the Defendant and Ms. Golding were standing with two MCSO deputies. Deputy Valdes asked the Defendant for the keys to his residence, and the Defendant complied. Deputy Valdes then went to the residence, where MCSO Deputy Boyd Williams was waiting. The gate and the front door of the residence were standing open. Deputy Valdes explained that he had learned that the Defendant and Ms. Golding had a roommate who was in the house, that the dispute had started there and that a knife was involved. His purpose in entering the house was to make sure everyone inside was all right.

The two deputies went inside the residence and announced themselves as Deputy Sheriffs. They went from room to room and located the female roommate, who proved to be the only occupant. She told them that the argument between the Defendant and Ms. Golding had become heated and she had locked herself in her room. The deputies then secured the premises.

Deputy Williams told Deputy Valdes that he had learned from another deputy that there was a gun concealed in the couch. Deputy Valdes lifted a pillow on the couch and found a sawed-off shotgun loaded with several rounds of ammunition. Deputy Valdes left the gun where he had found it and searched for the knife, which he located elsewhere. He identified Government's Exhibit 2A, excerpts from the video taken by the deputy's body-worn camera, which depicts the events inside the house, including the discoveries of the gun and the knife.

Deputy Valdes testified that after the premises had been secured, Ms. Golding returned to residence with another deputy. She was very cooperative and walked them through the house, describing what had taken place and where it had occurred. Ms. Golding never asked the deputies to leave or indicated that she did not want them there. Rather, she appeared to be very frightened and to welcome their presence.

On cross-examination by counsel for the Defendant, Deputy Valdes conceded that he did not know if anyone had entered or exited the residence between the time of the 911 call and his entry. He also acknowledged that when he asked the Defendant for the keys, he did not advise the Defendant that he could refuse the request. At that time, two MCSO deputies were present, one with the Defendant and one with Ms. Golding. Deputy Valdes explained that he wanted to check the residence for safety reasons because he knew there was a roommate inside. He did not ask the Defendant or Ms. Golding for explicit permission to enter the home.

Deputy Valdes testified that there was no one in the house besides the roommate, and thus there was no one who could pose a danger to himself or Deputy Williams. He also admitted that he had not seen the shotgun during the process of clearing the house, that he had to move a cushion aside to locate the gun, and that the place where the gun was found was not one where a person could have been hiding. The deputy pointed out that any time there is a weapon is involved in an incident, he wants to ensure that the weapon is safe.

Deputy Valdes stated that the roommate had been seated on the couch where the gun had been hidden, and that she had been asked to step outside while they searched for it. Prior to locating the shotgun, the deputies would not have allowed anyone to enter the house. He testified that he did not see the need to obtain a search warrant, which would have taken hours, because he only wanted to make sure that the weapon was safe. The deputy stated that Ms. Golding arrived a few minutes after the gun was found, and prior to that time, no one else had access to the house.

MCSO Deputy Boyd Williams was the second and final witness. Deputy Williams testified that he has worked for the MCSO for a total of 19 years and currently is a full-time trainer.

In August 2016, Deputy Williams was working patrol. He explained that he has handled more than 100 domestic violence cases, which were unpredictable and can be very dangerous.

Deputy Williams related that at about 5:45 a.m., he responded to a call at 43A 8th Avenue on Stock Island. He waited for backup outside the residence, where he previously had responded to another domestic violence call. When the deputy arrived, the participants in the incident were outside talking to other officers.

Deputy Williams identified Government's Exhibit 3A, the recording made by the body-worn camera of Deputy Dowling. During the recording, Ms. Golding says that the Defendant has a gun in the house and that he was going to shoot her. She states that he also has a knife. Ms. Golding relates that the Defendant was searching for the gun in the bedroom, but she knew it was in the sofa. Ms. Golding went on to say that she has come back to the Defendant before and forgiven him. The recording then captures Deputy Dowling advising Deputy Williams that there is gun in the sofa at the residence. Ms. Golding continues by telling Deputy Williams that she wants to press charges, that the Defendant has pointed a gun at her before, and that she had picked up the knife as the Defendant was trying to grab for it.

Deputy Williams testified that he and Deputy Valdes went inside the house and searched for the roommate. He added that because the door had been wide open, he was concerned that others might be inside. Deputy Williams located the roommate in the back bedroom and brought her to Deputy Valdes, where she remained while Deputy Williams continued to clear the house. When Deputy Williams learned that there was a gun in the sofa, he relayed that information to Deputy Valdes. The roommate, who was sitting on the sofa, was moved outside. The gun was located and left in place because Deputy Williams believed it might be evidence in the case.

Deputy Williams testified that he remained at the residence and was present when Ms. Golding returned. Ms. Golding walked Deputy Dowling through the house as she described happened and showed him where each event had occurred. This "walk-through" also is depicted on Government's Exhibit 3A.

On cross-examination, Deputy Williams conceded that Ms. Golding never gave explicit permission for the deputies to enter the residence. He also acknowledged that he keeps in his vehicle written consent to search forms. Deputy Williams corroborated the testimony of Deputy Valdes that the two of them initially entered the residence to search for the roommate; that only one person was found inside; that she was moved outside because she had been seated on the sofa where the gun was supposed to be located; that no one was allowed inside the house while they looked for the gun; that the gun was not visible until a cushion was moved; that the gate and front door to the residence were open when the deputies arrived, and that there is no way of knowing whether anyone entered or left hte house between the time the 911 call was placed and the deputies' arrival.

Deputy Williams testified that the 911 call had been placed from a cell phone and he did not know where Ms. Golding was located when she placed the call. He stated that he wanted to find the gun because he did not want a weapon in the house that was not accounted for. He added that the gun was not moved after it was found. Deputy Williams admitted that they could have obtained a search warrant for the gun before seizing it.

## II. **DISCUSSION**

The facts of this case are not in dispute. The Defendant argues that the deputies should have obtained a search warrant before seizing the shotgun. The Government responds that the officers had the implied consent of Ms. Golding to search the residence and that the search also was justified by the existence of exigent circumstances.

### A. **Implied Consent**

This Circuit has recognized that consent to enter and investigate inside a residence need not be explicit where the law enforcement officer has an objectively reasonable, good faith belief that he has such consent. Lawrence v. Gwinnett County, 557 Fed. Appx. 864, 871 (11th Cir. 2014). In Lawrence, police officer Dennis Doane responded to a 911 call placed from a residence by Lawrence's stepdaughter, who claimed that Lawrence was sexually abusing her. When Doane arrived, the stepdaughter ran out of the house, shouting something to the effect of "save me" or similar language, which implied that Lawrence had been holding her against her will. Outside the

house, the stepdaughter identified herself as an occupant of the residence and described what had taken place inside. Doane and the stepdaughter then entered the house, where he interviewed Lawrence. Doane testified that the stepdaughter had invited him inside, while the stepdaughter stated that Doane had asked her to go back inside with him to find out what was going on.

The Eleventh Circuit held that, under the totality of the circumstances, and regardless of whether the stepdaughter had given express verbal consent to enter the residence, Doane had an objectively reasonable, good faith belief that he had consent to enter. The court relied on the facts that (1) Doane responded to the house based on several 911 calls pertaining to an ongoing domestic disturbance at the residence, including a possible theat of violence involving a knife (and, potentially, a gun); (2) the calls had been made by an occupant of the residence; (3) upon Doane's arrival, the victim ran out of the residence and up to Doane shouting something to the effect of "save me;" (4) Doane asked the victim to accompany him into the residence, which she did, and (5) no one protested when Doane entered and reamined in the home during the investigation.

In a similar 4th Circuit case, United States v. Hylton, 349 F.3d 781 (4th Cir. 2003), Hylton's girlfriend called the police for assistance, telling them that her boyfriend was in her apartment with a gun and that he would not let her in. When police arrived, the girlfriend told them that the gun was located under the bed or the mattress in the bedroom. After about 40 minutes, police were able to persuade Hylton to exit the residence. Officers then entered the apartment and conducted a protective sweep to secure it and to retrieve the gun, which they located between the mattress and boxspring of the bed that had been identified by the girlfriend.

After noting that "[c]onsent may be inferred from actions as well as words, the court found that the circumstances and the girlfriend's words "lead to the inference that she gave consent to the police to search her apartment and thereby to enable her to return to the apartment in safety." Id. at 786. It also "can be inferred that she authorized officers to retrieve the gun that put her at risk." Id. The court observed that "[i]n the given circumstances, there would be virtually no other reason for her calling the police and giving them the details of what existed in the apartment." The court summarized its conclusion by stating:

> [W]hen a tenant expresses fear about a dangerous condition in her apartment and calls the police for assistance, it can be inferred that she is authorizing them to diffuse the dangerous condition; and when a tenant calls police for assistance, stating that she is barred from her apartment, expressing fear about the presence of a gun, and describing precisely where the gun is located, it can be inferred that she is authorizing the police to enter the apartment and retrieve the gun.

Id. at 786-87. The court added that a tenant in such circumstances "would rightfully be critical of the police if they hesitated to assist her by diffusing a dangerous situation in her own apartment." Id. at 787.

In another 4th Circuit case, United States v. Toyer, 444 Fed. Appx. 584 (4th Cir. 2011), police officers responded to a 911 call placed by Kimberly Elliot, a friend of Toyer's sister, Kimberly Ballard. In the call, Elliot told the dispatcher that Toyer had threatened to shoot her if she did not leave the house. Ballard and Elliot met the officers at the door to the residence and told them that Toyer had been drinking a might be intoxicated, and that he was in the basement of the house. The officers entered the house, identified themselves and asked Toyer to come upstairs from the basement. Toyer complied, after which he was handcuffed and searched. When asked whether he had a gun, Toyer replied that he did not.

Based on a prior statement by Elliot that Toyer kept the gun "downstairs," possibly on a shelf, one of the officers searched the basement twice and did not find the gun. Another officer, who had just arrived at the scene, told the searching officer that Elliot had stated that gun might be in the drop ceiling of the basement. A third search of the basement was conducted, and two handguns were found in the drop ceiling. The guns were fully loaded, with their safeties off and rounds in their chambers. Toyer was then placed under arrest.

Toyer argued that the search for weapons exceeded any consent that might have been given and that no other exception to the warrant requirement applied. The court first noted that "[the] scope of consent for a search is 'objective reasonableness,' or rather, what a reasonable person would have understood from the exchange between the officer and the consenting person." Id. at 589 (citation omitted). The court concluded that the situation, a domestic dispute involving threats of

violence with a gun, was similar to that in Hylton, and that even if Ballard and Elliot had not given express consent to search the house for weapons, the officers reasonably inferred that such implicit consent had been given.

> Though [Elliot] did not explicitly state "I consent for you to search the basement area for the gun," it is reasonable to believe that a rational officer would find here statements about the whereabouts of the gun to be consent to search for the gun. Furthermore, it is reasonable for the officers responding to the frantic 911 call to believe that both Ballard and Elliot were giving consent for the officers to enter the house, search for Toyer and his weapon, and diffuse the potentially dangerous situation.

Id. at 590. The court also pointed out that neither Ballard nor Elliot had withdrawn their consent, and "while Toyer, who was a co-habitant of the house, could have expressly refused consent for the police to enter and search the house for weapons, he did no such thing."

There is no material distinction between the facts of the instant case and those of Hylton and Toyer. Here, Ms. Golding made frantic 911 calls stating that she is being threatened by a man, presumably her husband because she gave his last name and her own as "Moore," and that he has a knife. Once on the scene, the deputies learned that there was a roommate inside the house, and they entered the house to locate anyone who might be inside.[1] After finding the roommate, the deputies learned from Ms. Golding that there was gun in the sofa, and the deputies then searched for and located both the gun and the knife. As was the case in both Hylton and Toyer, there was no one in the house who posed a danger to the deputies while they searched for the weapons. After the gun was found, Ms. Golding returned to the residence and showed the police where all of the pertinent events had occurred, and at no time did either Ms. Golding or the Defendant object to the actions of the deputies.

Under these circumstances, it was, as in Toyer, reasonable for deputies responding to the frantic 911 calls to believe that Ms. Golding was giving them consent to enter the house, search for the weapons, and diffuse the potentially dangerous situation. And because the deputies

---

[1] At the hearing, the Defendant did not argue that the deputies' warrantless entry into the house was unlawful.

had an objectively reasonable, good faith belief that they had consent to enter and search, consent is implied and a search warrant was not required.

### B. Exigent Circumstances

The law is clear that "[t]he exigent circumstances exception to the fourth amendment warrant requirement applies in 'those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.'" United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983) (quoting Arkansas v. Sanders, 442 U.S. 753, 759 (1979)). Thus, "the warrantless seizure of a gun is 'objectively reasonable' under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large." United States v. Newsome, 475 F.3d 1221, 1226 (11th Cir. 2007) (citations omitted). In cases involving domestic violence, "which are highly volatile and involve large risks," even where the person who might use the gun is handcuffed at the time of the search, exigent circumstances justify police in searching for and securing the weapon if they have reason to believe it is in a particular location within a residence. United States v. Henderson, 553 F.3d 1163, 1165 (8th Cir. 2009).

For these reasons, the Toyer court found that the officers "reasonably believed that the urgency and safety risks posed by the situation required them to secure both Toyer *and* his weapon." 441 Fed. Appx. at 591-92 (emphasis in original). The court emphasized that "the officers searched the house only for Toyer and his firearm – the person and item that posed the risk in the situation," and did not look around the house for other contraband or look in places other than those identified by Elliot as locations where the gun might be found. Id. at 591. Therefore, the court concluded that "exigent circumstances necessitated the warrantless search of Toyer's residence not only to secure him, but also the weapon he used to threaten other occupants of the house." Id. at 592.

Once again, there is no meaningful distinction between the facts of Toyer and those of the instant case. Here, Ms. Golding told the deputies that the Defendant had a knife and a gun, and she specifically identified the location of the gun. The deputies immediately looked for and found the gun in that place, and they stopped searching as soon as the knife was recovered.

9

Accordingly, the undersigned finds that exigent circumstances justified the deputies' warrantless search for weapons, and evidence seized as the result of that search is admissible.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that Defendant, Benjamin Moore's Motion to Suppress Physical Evidence (ECF No. 16) be DENIED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable K. Michael Moore, Chief United States District Judge. Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 27th day of April, 2017.

*[signature]*
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA David Turken (MIA)
AUSA Carey Aronovitz (MIA)
AFPD Stewart Abrams (MIA)